IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED

OCT 26 2012

CLERK, US DISTRICT COURT
NORFOLK, VA

INNOVATIVE COMMUNICATIONS
TECHNOLOGIES, INC.,
    Plaintiff,

    v.                                             Civil No. 2:12cv7

VIVOX, INC.,
    Defendant,

- and -

INNOVATIVE COMMUNICATIONS
TECHNOLOGIES, INC.,
    Plaintiff,

    v.                                             Civil No. 2:12cv9

STALKER SOFTWARE, INC.,
    Defendant.

## OPINION AND ORDER

These cases involve actions alleging infringement of five patents owned by plaintiff Innovative Communications Technologies, Inc. ("Innovative") which disclose an invention concerning internet telephony technology, also known as Voice Over Internet Protocol ("VoIP"). The first patent is entitled "Point-to-Point Internet Protocol" and was issued on August 22, 2000, as United States Patent No. 6,108,704 (the "'704 patent"). The second patent is entitled "Point-to-Point Computer Network Communication Utility Utilizing Dynamically Assigned Network Protocol Addresses" and was issued on October 10, 2000, as United States Patent No. 6,131,121 (the "'121 patent"). The third patent is entitled "Graphic User Interface for Internet Telephony Application" and was issued on December 28, 1999, as United States Patent No. 6,009,469 (the "'469 patent"). The fourth patent is entitled "Point-to-Point Internet Protocol" and was issued on March 2, 2004, as

United States Patent No. 6,701,365 (the "'365 patent"). The fifth patent is entitled "Establishing a Point-to-Point Internet Communication" and was issued on January 28, 2003, as United States Patent No. 6,513,066 (the "'066 patent"). The original patent application disclosing the invention was filed on September 25, 1995, and was issued as the '704 patent. The other four patents were issued from continuing patent applications, each of which claims priority to the original September 25, 1995, application.

Presently before the Court is the claim construction of several terms found in claims of these five patents. The Court's construction of these terms is explained herein.

## I. BACKGROUND

### A. The Invention

Innovative, a Delaware corporation with its alleged principal place of business in Virginia, is the assignee of the '704, '121, '469, '365, and '066 patents. In the preferred embodiment, these patents describe a method for delivering real-time "point-to-point" voice communications services over the Internet, similar to direct-dial voice calls made over traditional telephone networks. The invention disclosed in these patents addresses an apparently common problem in the field of internet telephony—although real-time "point-to-point" communications are readily supported between computers with fixed Internet Protocol (IP) addresses, such communications are not so easily established between computers with dynamically assigned IP addresses, which may change as often as every time the computer user connects to the Internet. The plaintiff has suggested an apt analogy in which one person seeks to initiate a telephone call to a second person whose telephone number changes after each call. The '704 patent provides a method for overcoming this problem by providing what amounts to an electronic phonebook or directory assistance service, permitting the first computer to obtain the second computer's current IP address (or phone number) from a

connection server (the electronic phonebook or directory assistance service), and then initiate "point-to-point" voice communications (a direct-dial call) between the two computers over the Internet, without any further assistance or intervention by the connection server. The other four patents describe refinements or enhancements to the invention as originally disclosed.

### B. Procedural History

On January 4, 2012, Innovative filed suit against defendant Vivox, Inc. ("Vivox"), alleging in a five-count complaint that Vivox infringed the '704, '121, '469, '365, and '066 patents by "selling, offering to sell, and using VoIP products and/or services, such as VoiceEverywhere Game Connect." That same day, Innovative also filed suit against defendant Stalker Software, Inc., doing business as CommuniGate Systems ("CommuniGate"), alleging in a three-count patent that CommuniGate infringed the '704, '365, and '066 patents by "selling, offering to sell, and using VoIP products and/or services, such as the CommuniGate Pro Server." Innovative also sued a third defendant, ooVoo, LLC ("ooVoo"), but that action was settled and voluntarily dismissed by stipulation on October 11, 2012.

In a joint statement submitted to the Court on August 7, 2012, the parties identified twenty-one disputed claim terms, grouped into fifteen sets of similar or related terms. The parties were able to agree, however, that the claim term "process," found throughout the patents-in-suit, means "a running instance of a computer program or application."

On September 14, 2012, each side filed its claim construction brief and supporting exhibits. In their claim construction brief, the defendants conceded that three of the original disputed claim terms need not be construed as their meaning is clear based upon the plain and ordinary meaning of the terms. These terms include: "in response to an identification of one of the entries by a requesting process providing one of the identifier and the network protocol address to the requesting process

3

providing one of the identifier and the network protocol address to the requesting process";

"retrieving the IP address of the second unit from the database using the connection server"; and

"retrieving the IP address of the second processing unit in response to the positive on-line status of the second processing unit."

On October 10, 2012, the Court held a <u>Markman</u> hearing. At hearing, the defendants further conceded that an additional eight of the original disputed claim terms need not be construed as their meaning is clear based upon the plain and ordinary meaning of the terms. These terms include: "query"; "server process"; "server"; "address server"; "database"; "program code configured to receive the current network protocol address of one of the processes coupled to the network, the network protocol address being received by said one of the processes from an Internet access server"; "program code configured to receive an identifier associated with said one process"; and "program code configured to receive queries or one of the network protocol address and the associated identifier of said one of the processes from other processes over the computer network at the server, and to allow the establishment of a packet-based point-to-point communication between said one of the processes and one of said other processes."[1]

### C. Disputed Claim Terms

Eleven claim terms remain in dispute:

1. "point to point" found in claim 1 of the '704 patent, claims 8, 13, and 14 of the '121 patent, claim 5 of the '469 patent, claims 1 and 3 of the '365 patent, and claims 1, 2, 6, and 7 of the '066 patent;

2. "establishing a point-to-point communication" found in claim 1 of the '704 patent, claims 8, 13, and 14 of the '121 patent, claim 5 of the '469 patent, and claims 1, 2, 6, and 7 of the '066 patent;

---

[1] ooVoo appears to have been the defendant primarily concerned with these claim terms. ooVoo participated in the claim construction briefing process, but it did not participate in the <u>Markman</u> hearing on October 10, 2012.

4

3. "to allow the establishment of a packet-based point-to-point communication" found in claims 1 and 3 of the '365 patent;

4. "network protocol address" found in claims 1, 33, 36, 38, and 41 of the '704 patent, claims 8, 13, and 14 of the '121 patent, claims 5 and 6 of the '469 patent, and claims 1 and 3 of the '365 patent;

5. "dynamically assigned network protocol address" found in claim 33 of the '704 patent and claim 8 of the '121 patent;

6. "computer usable medium" found in claims 1 and 38 of the '704 patent and claim 1 of the '365 patent;

7. "assigned to the process upon connection to the computer network" found in claims 33 and 38 of the '704 patent;

8. "received by the first process following connection to the computer network" found in claim 1 of the '704 patent and claims 13 and 14 of the '121 patent;

9. "off-line message" found in claims 3 and 8 of the '066 patent;

10. "online message" or "on-line message" found in claims 6 and 7 of the '066 patent; and

11. "providing one of the network protocol address and the associated identifier of said one process" found in claim 3 of the '365 patent.

## II. APPLICABLE LAW

Patents consist of "claims," and claim construction is a matter of law to be determined by the Court. Markman v. Westview Instruments, Inc., 517 U.S. 370, 388 (1996). The purpose of claim construction is to "determin[e] the meaning and scope of the patent claims asserted to be infringed." Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted).

"The words of a claim are generally given their ordinary and customary meaning." Id. at 1312. "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the

effective filing date of the patent application." Id. at 1313. Moreover, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Id.

"In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than application of the widely accepted meaning of commonly understood words." Id. at 1314. As the Federal Circuit has repeatedly held, "a district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims." O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd., 521 F.3d 1351, 1360 (Fed. Cir. 2008) (footnote omitted); see also id. at 1362 ("[D]istrict courts are not (and should not be) required to construe every limitation present in a patent's asserted claims. . . . Claim construction 'is not an obligatory exercise in redundancy.'") (quoting U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997)) (emphasis in original).

In other cases, however, "determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." Phillips, 415 F.3d at 1314. In such cases, the Court must look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean. Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." Id. (internal quotation marks omitted).

The Court must begin with the intrinsic record, which consists of the claims, the specification, and the prosecution history. Markman, 52 F.3d at 979. "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Vitrionics

6

Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). The Court looks first to the claim language, then "to the rest of the intrinsic evidence, beginning with the specification and concluding with the prosecution history, if in evidence." Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001).

The Court first looks "to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention." Vitrionics, 90 F.3d at 1582. "If the claim language is clear on its face, then [the Court's] consideration of the rest of the intrinsic evidence is restricted to determining if a deviation from the clear language of the claims is specified." Interactive Gift Express, 256 F.3d at 1331. As the Federal Circuit has recently reiterated, there are only two circumstances in which claim interpretation may deviate from the ordinary and customary meaning of the claim terms: "1) when a patentee sets out a definition and acts as its own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." Thorner v. Sony Entm't Am. LLC, 669 F.3d 1362, 1365 (Fed. Cir. 2012); see also Phillips, 415 F.3d at 1316–17; Interactive Gift Express, 256 F.3d at 1331. "If however the claim language is not clear on its face, then our consideration of the rest of the intrinsic evidence is directed to resolving, if possible the lack of clarity." Interactive Gift Express, 256 F.3d at 1331.

The Court looks next to the specification "to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." Vitrionics, 90 F.3d at 1582. "The specification contains a written description of the invention that must enable one of ordinary skill in the art to make and use the invention." Markman, 52 F.3d at 979. The specification is statutorily required to describe the claimed invention in "full, clear, concise, and exact terms." 35 U.S.C. § 112(a). It "may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs."

7

Phillips, 415 F.3d at 1316. "In other cases, the specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." Id. "[A]lthough the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments." Id. at 1323.

> To avoid importing limitations from the specification into the claims, it is important to keep in mind that the purposes of the specification are to teach and enable those of skill in the art to make and use the invention and to provide a best mode for doing so. One of the best ways to teach a person of ordinary skill in the art how to make and use the invention is to provide an example of how to practice the invention in a particular case. Much of the time, upon reading the specification in that context, it will become clear whether the patentee is setting out specific examples of the invention to accomplish those goals, or whether the patentee instead intends for the claims and the embodiments in the specification to be strictly coextensive.

Id. "[T]he specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" Id. at 1315 (quoting Vitrionics, 90 F.3d at 1582).

In addition to the specification, the Court "should also consider the patent's prosecution history, if it is evidence." Markman, 52 F.3d at 980. The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." Phillips, 415 F.3d at 1317; Vitrionics, 90 F.3d at 1582. "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent," but "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." Phillips, 415 F.3d at 1317. "Nonetheless, the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the

invention in the course of prosecution, making the claim scope narrower than it would otherwise be." Id.

Finally, the Court may, in some cases, consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history." Markman, 52 F.3d at 980. Although "extrinsic evidence can shed useful light on the relevant art, . . . it is less significant than the intrinsic record in determining the legally operative meaning of claim language." Phillips, 415 F.3d at 1317 (internal quotation marks omitted). Generally, the Court may turn to extrinsic evidence to construe a claim "only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." Interactive Gift Express, 256 F.3d at 1332; see also Vitrionics, 90 F.3d at 1583. "[I]deally there should be no 'ambiguity' in claim language to one of ordinary skill in the art that would require resort to evidence outside the specification and prosecution history." Markman, 52 F.3d at 986.

"Extrinsic evidence may always be consulted, however, to assist in understanding the underlying technology." Interactive Gift Express, 256 F.3d at 1332. "[B]ecause extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean, it is permissible for the district court in its sound discretion to admit and use such evidence." Phillips, 415 F.3d at 1319. "[C]onsultation of extrinsic evidence is particularly appropriate to ensure that [the Court's] understanding of the technical aspects of the patent is not entirely at variance with the understanding of one skilled in the art." Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999); see also Dow Chem. Co. v. Sumitomo Chem. Co., Ltd., 257 F.3d 1364, 1373 (Fed. Cir. 2001) ("[T]echnical terms often have an 'ordinary meaning' as understood by one of ordinary skill in the art, although these same terms may not be readily familiar to a judge, or may be familiar only in

a different context."). "This evidence may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history." Markman, 52 F.3d at 980.

> A judge is not usually a person conversant in the particular technical art involved and is not the hypothetical person skilled in the art to whom a patent is addressed. Extrinsic evidence, therefore, may be necessary to inform the court about the language in which the patent is written. But this evidence is not for the purpose of clarifying any ambiguity in claim terminology. It is not ambiguity in the document that creates the need for extrinsic evidence but rather unfamiliarity of the court with the terminology of the art to which the patent is addressed.

Id. at 986. Thus, the Court must remain mindful that "[e]xtrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms in the claims." Id. at 981; see also Dow Chem., 257 F.3d at 1373 ("This extrinsic evidence may be used only to assist in the proper understanding of the disputed limitation; it may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even implicitly, in the specification or file history."). As the Federal Circuit has observed, "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." Phillips, 415 F.3d at 1319.

With these principles in mind, the construction of the disputed claim terms will proceed.

## III. CLAIM CONSTRUCTION

### A. "point to point"

The disputed claim term "point to point" is found in claim 1 of the '704 patent, claims 8, 13, and 14 of the '121 patent, claim 5 of the '469 patent, claims 1 and 3 of the '365 patent, and claims 1, 2, 6, and 7 of the '066 patent. The plaintiff contends that the claim term "point-to-point" used in these claims means "communications between two processes over a computer network that are not intermediated by a connection server or an address server." The defendants contend that "point-to-

point" means "direct communication, initiated solely by one of the processes, and not intermediated by a connection server, gateway, or similar device."

The Court first looks to the language of the claims in which the term "point to point" appears. Several claims in the patents-in-suit use the term to describe "a method of establishing point-to-point communication" between two computer processes over a computer network. '121 patent col.44 ll.30–31 (claim 13); '469 patent col.42 ll.11–13 (claim 5); '365 patent col. 12 ll.14, 31–33 (claim 3). Other claims use the term to describe "program code" or "program logic" configured "to establish a point-to-point communication link" or "to allow establishment of packet-based point-to-point communication" between two computer processes over a computer network. '704 patent col.11 ll.18–22 (claim 1); '121 patent col.43 ll.28–31 (claim 8); id. col.44 ll.42–45 (claim 13); id. col. 44 ll.61–65 (claim 14); '365 patent col.11 ll.24–31 (claim 1). The claims of the '066 patent differ slightly in that their use of the term to describe a "method" or "system" for "establishing a point-to-point communication link" between two computer units over the Internet, rather than between computer processes over an unspecified computer network. '066 patent col.12 ll.7–8, 18–20 (claim 1); id. col.12 ll.21, 35–38 (claim 2); id. col.12 ll.63–64, col.13 ll.9–11 (claim 6); id. col.13 ll.12, 19–21 (claim 7).

It is clear from this language that the invention concerns communication between two processes over a computer network, but the meaning of the term "point to point" is vigorously disputed. The Court thus looks to the rest of the intrinsic evidence to resolve any lack of clarity.

The Court has reviewed the specifications of each of the five patents-in-suit. Nowhere in the specifications has the patentee acted as its own lexicographer and clearly defined "point-to-point." Nor has the patentee clearly disavowed the full scope of the claim language. Each patent's specification includes the following passage describing a preferred embodiment of the invention:

The first processing unit 12 then sends a query, including the E-mail address of the callee, to the connection server 26. The connection server 26 then searches the database 34 to determine whether the callee is logged-in by finding any stored information corresponding to the callee's E-mail address indicating that the callee is active and on-line. If the callee is active and on-line, the connection server 26 then performs the primary point-to-point protocol;[2] i.e. the IP address of the callee is retrieved from the database 34 and sent to the first processing unit 12. The first processing unit 12 may then directly establish the point-to-point Internet communications with the callee using the IP address of the callee.

'704 patent col.5 ll.55–67; '121 patent col.7 ll.24–37; '469 patent col.7 ll.30–42; '365 patent col.5

l.66–col.6 l.11; '066 patent col.6 ll.28–41. The '121 patent and the '469 patent also contain common

specification language, further describing a preferred embodiment of the invention:

The primary and secondary point-to-point Internet protocols previously described enable users to establish real-time direct communication links over the Internet or other computer networks without the need for any interaction with connection server 26, the connection server providing only directory and information related services.

'121 patent col. 12 ll.41–46; '469 patent col. 12 ll.48–53.

The Court has also reviewed the prosecution history, to the extent it is in evidence. In

response to an adverse office action by the examiner during prosecution of the '704 patent, the

patentee provided the following remarks with respect to the nature of the invention:

One of the major factors inhibiting dynamic communications over the Internet, and other computer networks, is the inability to obtain the current dynamically assigned network protoc[o]l address of a user process connected to the network. This problem is analogous to trying to call someone whose telephone number changes after each call. Applicant's invention provides techniques for determining the current dynamically assigned network protoc[o]l address of a user process connected to the network. The first technique utilizes a dedicated server which acts as a network

---

[2] The Court notes that the patents disclose an invention comprising two alternative protocols for establishing a point-to-point communication link. The alleged infringement in these cases exclusively involves the primary point-to-point protocol, which concerns the use of a connection server to furnish one computer process with the dynamically assigned network protocol address of a second computer process. The secondary point-to-point protocol, not at issue in this litigation, concerns an exchange of network protocol addresses between two computer processes by e-mail, involving no interaction at all with a connection server.

> address/information directory from which calling processes can obtain information. When a first process connects to the network, the process logs-on to the server and provides the server with the network protoc[o]l address under which the first process is currently operating. A second process[,] wishing to establish communications with the first process, connects to the server and request[s] the network protoc[o]l address under which the first process is currently operating. Upon receipt of the network protoc[o]l address of the first process, the second process establishes communications with the first process directly, without any interven[t]ion from the address/information server.

Pl.'s Ex. C, at 7–8. The patentee subsequently provided virtually identical remarks in response to an adverse office action during prosecution of the '365 patent. Pl.'s Ex. K, at 4.

Based on the descriptions of the invention as set forth in the specifications and the prosecution history of the patents-in-suit, the Court agrees with plaintiff Innovative that "point-to-point" means "communications between two processes over a computer network that are not intermediated by a connection server or an address server." The descriptions quoted above clearly describe a method or system in which two processes communicate over a computer network without any intermediation by the connection server. Although the connection server provides preliminary assistance to the caller process, furnishing it with the current dynamically assigned network protocol address of the callee process, once this preliminary role is done, the connection server plays no part in establishing the communication link between the caller and callee processes. Based on the claims, the specification, and the prosecution history in evidence, the connection server in the patented invention simply does not intermediate, or come between, the two processes in their communications over a computer network. See Webster's Third New International Dictionary of the English Language, Unabridged 1180 (Philip Babcock Gove ed., 1981) (defining the verb "intermediate" as "to come between"). The Court further notes that the defendants agree that "point-to-point" communications are "not intermediated by a connection server," incorporating that very same language into their proposed construction of the claim term.

13

The defendants' proposed construction seeks to further narrow the scope of the "point to point" claim language in three respects. First, the defendants seek to limit the construction to "direct" communications between computer processes. But adding this limitation would be redundant and would add nothing to the construction of the term "point to point." See Cleancut LLC v. Rug Doctor, Inc., No. 2:08-CV-836-TC, 2011 WL 5057005, at *2 (D. Utah Oct. 19, 2011). The parties already have agreed, as does the Court, that "point-to-point" communications are "not intermediated by a connection server." Moreover, to the extent the addition of the modifier "direct" would further narrow the scope of the disputed claim language, the specification language upon which the defendants rely describes an exemplary embodiment of the invention, and thus it would be improper to construe the claims of the patent as being limited to the described embodiment. See Phillips, 415 F.3d at 1323. The Court also notes that the prosecution history upon which the defendants rely on this point contains no clear and unmistakable disclaimer of the full scope of the claim language. See Thorner, 669 F.3d at 1366–67.

Second, the defendants seek to limit the construction to communications "initiated solely by one of the processes." In support of this limitation, the defendants rely on remarks in the prosecution history of the '704 patent, in which the patentee stated: "[C]ommunications between two nodes, e.g. processes, are initiated . . . solely by one of the processes. The address server does not establish the point-to-point communication connection between the nodes." Pl.'s Ex. C, at 9. This proposed limitation is likewise redundant and adds nothing to the construction of the term "point to point." See Cleancut, 2011 WL 5057005, at *2. The cited remarks simply distinguish the patented invention from prior art that appears to have involved intermediation by an address server. Moreover, to the extent that the addition of this language would further narrow the scope of the disputed claim language, the Court notes that the prosecution history upon which the defendants rely contains no

14

clear and unmistakable disclaimer of the full scope of the claim language. See Thorner, 669 F.3d at 1366–67.

Third, the defendants seek to limit the construction to communications "not intermediated by a connection server, gateway, or similar device." By adding "gateway or similar device," the defendants' proposed construction would broaden the scope of intermediary devices that may not come between the caller and callee processes, thus narrowing the scope of the "point to point" claim language. In support of this limitation, the defendants rely solely upon statements by one of the inventors and by a prior owner of the patents-in-suit, made during litigation against another defendant, before another court, and settled prior to any decision on claim construction. But the Court finds no ambiguity in the claim language after consideration of the intrinsic evidence, thus resort to this extrinsic evidence would be improper. See Interactive Gift Express, 256 F.3d at 1332; Vitrionics, 90 F.3d at 1583. Moreover, this proposed limitation would exclude a preferred embodiment of the invention. See Primos, Inc. v. Hunter's Specialties, Inc., 451 F.3d 841, 848 (Fed. Cir. 2006) ("[A court] should not normally interpret a claim term to exclude a preferred embodiment."); Vitrionics, 90 F.3d at 1583 ("[A]n interpretation [that excludes a preferred embodiment] is rarely, if ever, correct and would require highly persuasive evidentiary support . . . ."). The patent specifications explain that, in the preferred embodiment, the caller and callee processing units are "operatively connected to the Internet 24 by communication devices and software known in the art, such as an Internet Service Provider (ISP) or an Internet gateway." '121 patent col. 4 ll.43–46; '469 patent col. 4 ll.51–54.[3] The preferred embodiment of the invention

---

[3] The other three patent specifications similarly describe a preferred embodiment in which the two processing units are "operatively connected to the Internet 24 by communication devices and software known in the art," but they omit the specific examples of ISPs and Internet gateways. See '704 patent col.3 ll.11–13; '365 patent col.3 ll.19–21; '066 patent col.3 ll.31–33. Nevertheless, all

described in the patent specifications clearly involves the use of intermediary devices through which each of the communicating processes connects to the Internet or other computer network, excluding only intermediation by a connection or address server.

Accordingly, the Court **FINDS** that the ordinary and customary meaning of the term "point to point" found in claim 1 of the '704 patent, claims 8, 13, and 14 of the '121 patent, claim 5 of the '469 patent, claims 1 and 3 of the '365 patent, and claims 1, 2, 6, and 7 of the '066 patent, as understood by a person of skill in the art at the time of invention, is "communications between two processes over a computer network that are not intermediated by a connection server."

### B. "establishing a point-to-point communication" and "to allow the establishment of a packet-based point-to-point communication"

The disputed claim term "establishing a point-to-point communication" is found in claim 1 of the '704 patent, claims 8, 13, and 14 of the '121 patent, claim 5 of the '469 patent, and claims 1, 2, 6, and 7 of the '066 patent. The disputed claim term "to allow the establishment of a packet-based point-to-point communication" is found in claims 1 and 3 of the '365 patent. The plaintiff contends that no construction of these claim terms is necessary as they have plain and ordinary meaning. The defendants contend that these terms should be construed to mean "using the network protocol address retrieved by the server from its database to create a direct communication, initiated solely by one of the processes, and not intermediated by a connection server, gateway, or similar device."

Having already construed the term "point-to-point," the Court **FINDS** that the ordinary and customary meaning of the claim terms "establishing a point-to-point communication" and "to allow the establishment of a packet-based point-to-point communication," as understood by a person of skill in the art when read in the context of the entire patent, is readily apparent even to a layperson.

---

five patents clearly contemplate that the caller and callee processing units will be connected to the Internet or another computer network by a gateway or some other device.

See Phillips, 415 F.3d at 1314. Accordingly, the Court **DECLINES** to construe these claim terms. See O2 Micro Int'l, 521 F.3d at 1360, 1362.

### C. "network protocol address"

The disputed claim term "network protocol address" is found in claims 1, 33, 36, 38, and 41 of the '704 patent, claims 8, 13, and 14 of the '121 patent, claims 5 and 6 of the '469 patent, and claims 1 and 3 of the '365 patent. The plaintiff contends that no construction of this claim term is necessary as it has a plain and ordinary meaning. In their claim construction brief, the defendants contended that this term should be construed to mean "information sufficient to direct data to a particular process on the computer network, i.e., IP address and socket address if the Internet Protocol is being used." At hearing, the defendants noted that the use of "i.e." (meaning "that is") in their proposed construction was a scrivener's error; the defendants verbally amended their proposed construction to substitute "e.g." (meaning "for example") in its place.

The Court **FINDS** that the ordinary and customary meaning of the claim term "network protocol address," as understood by a person of skill in the art when read in the context of the entire patent, is readily apparent even to a layperson. See Phillips, 415 F.3d at 1314. Accordingly, the Court **DECLINES** to construe this claim term. See O2 Micro Int'l, 521 F.3d at 1360, 1362.

### D. "dynamically assigned network protocol address"

The disputed claim term "dynamically assigned network protocol address" is found in claim 33 of the '704 patent and claim 8 of the '121 patent. The plaintiff contends that no construction of this claim term is necessary as it has a plain and ordinary meaning. The defendants contend that this term should be construed to mean "network protocol address that is assigned on a temporary basis."

The Court first looks to the language of the claims in which the term "dynamically assigned network protocol address" appears. Claim 33 of the '704 patent uses the term to describe "[a]

17

method for locating processes having <u>dynamically assigned network protocol addresses</u> over a computer network." '704 patent col. 15 ll.3–5. Claim 8 of the '121 patent uses the term to describe "program logic" configured to "forward to the address server a <u>dynamically assigned network protocol address</u> at which the first process is connected to the computer network," and "receive a <u>dynamically assigned network protocol address</u> of the second process from the address server." '121 patent reexamination certificate col. 2 ll.1–3, 9–11.

The Court has declined to construe the claim term "network protocol address," having found that the ordinary and customary meaning of the claim term "network protocol address," as understood by a person of skill in the art when read in the context of the entire patent, is readily apparent even to a layperson. But the meaning of "dynamically assigned" when coupled with "network protocol address" is not clear on the face of the claim language. The Court thus looks to the rest of the intrinsic evidence to resolve any lack of clarity.

The Court has reviewed the specifications of each of the five patents-in-suit. Nowhere in the specifications has the patentee acted as its own lexicographer and clearly defined "dynamically assigned" or "dynamically assigned network protocol address." Nor has the patentee clearly disavowed the full scope of the claim language. The specification of the '704 patent contains the following passage describing a preferred embodiment of the invention:

> When either of processing units 12, 22 logs on to the Internet via a dial-up connection, the respective unit is provided a dynamically allocated IP address by a connection service provider.
>
> Upon the first user initiating the point-to-point Internet protocol when the first user is logged on to Internet 24, the first processing unit 12 automatically transmits its associated E-mail address and its dynamically allocated IP address to the connection server 26.

'704 patent col.5 ll.21–29.

The '121 patent and the '469 patent also contain common specification language, describing

the background of the invention and explaining the purpose of the invention:

> The ability to locate users having temporary or dynamically assigned Internet
> Protocol address[es] has been difficult without the user manually initiating
> the communication. Accordingly, spontaneous, real-time communications
> with such users over computer networks have been impractical. . . .
>
> Accordingly, a need exists . . . for a way to obtain the dynamically assigned
> Internet Protocol address of a user having on-line status with respect to a
> computer network, particularly the Internet.

'121 patent col.2 ll.41–61; '469 patent col.2 ll.38–57.

The '121 patent and '469 patent also contain common specification language describing a

preferred embodiment of the invention:

> As shown in FIG. 1, the disclosed point-to-point Internet protocol and system
> 10 operate when a callee processing unit does not have a fixed or
> predetermined IP address. In the exemplary embodiment and without loss of
> generality, the first processing unit 12 is the caller processing unit and the
> second processing unit 22 is the callee processing unit. When either of
> processing units 12, 22 logs on to the Internet via a dial-up connection, the
> respective unit is provided a dynamically allocated IP address by an Internet
> service provider.
>
> Upon the first user initiating the point-to-point Internet protocol when the
> first user is logged on to the Internet 24, the first processing unit 12
> automatically transmits its associated E-mail address and its dynamically
> allocated IP address to the connection server 26.

'121 patent col.6 ll.50–64; '469 patent col.6 l.56–col.7 l.3. The '121 and '469 patent specifications

go on to further describe the preferred embodiment in great detail, including a "WebPhone" software

application and related protocol:

> In one calling scenario, a WebPhone user knows the E-mail address of
> another WebPhone user to which he/she wishes to establish a point-to-point
> communication, however, the current dynamically assigned Internet protocol
> address of the callee is unknown to the caller. In this scenario, the user of
> WebPhone 1536 requests assistance from global server 1500 to obtain the
> current dynamically assigned Internet Protocol address of the prospective
> callee WebPhone.

. . . .

> The methods and apparatus described herein provide computer users with a powerful protocol in which to directly establish real-time, point-to-point communications over computer networks directly without server required linking. The a [sic] directory server assists in furnishing the current dynamically assigned internet protocol address of other similarly equipped computer users or information about such users.

'121 patent col.23 ll.41–49, col.26 ll.23–30; '469 patent col.23 ll.48–56, col.26 ll.31–38.

The Court has also reviewed the prosecution history, to the extent it is in evidence. On reexamination, the '121 patent was amended to add the words "dynamically assigned" to the claim term "network protocol address" in claim 8(A) and (C). See '121 patent reexamination certificate col. 2 ll.1–3, 9–11. This amendment was made in response to an obviousness rejection involving "the near-universal adoption of the Dynamic Host Configuration Protocol ('DHCP') described in RFC 1531 . . . ." Defs.' J.A. 0293. See generally R. Droms, RFC 1531: Dynamic Host Configuration Protocol (Oct. 1993) (hereinafter "RFC 1531"). RFC 1531 is cited as prior art considered on reexamination of both the '704 and '121 patents. See '704 patent reexamination certificate 10; '121 patent reexamination certificate 10. It has been submitted into evidence in this case by the defendants. Defs.' J.A. 0381–0419.

RFC 1531 explains what "dynamic allocation" would have meant to a person of ordinary skill in the art in question at the time of the invention:

> DHCP supports three mechanisms for IP address allocation. In "automatic allocation", DHCP assigns a permanent IP address to a host. In "dynamic allocation", DHCP assigns an IP address to a host for a limited period of time (or until the host explicitly relinquishes the address). In "manual allocation", a host's IP address is assigned by the network administrator, and DHCP is used simply to convey the assigned address to the host. A particular network will use one or more of these mechanisms, depending on the policies of the network administrator.

> Dynamic allocation is the only one of the three mechanisms that allows automatic reuse of an address that is no longer needed by the host to which it was assigned. Thus, dynamic allocation is particularly useful for assigning

> an address to a host that will be connected to the network only temporarily or for sharing a limited pool of IP addresses among a group of hosts that do not need permanent IP addresses. Dynamic allocation may also be a good choice for assigning an IP address to a new host being permanently connected to a network where IP addresses are sufficiently scarce that it is important to reclaim them when old hosts are retired. . . .

RFC 1531, at 3 (Defs.' J.A. 0383).

Based on the descriptions of the invention as set forth in the specifications and the prosecution history of the patents-in-suit, the Court concludes that "dynamically assigned network protocol address" in the context of the patents-in-suit means "a network protocol address assigned to a host for a limited period of time (or until the host explicitly relinquishes the address)."

The defendants suggest that a "dynamically assigned network protocol address" should instead be construed as a "network protocol address that is assigned on a temporary basis." But the specification language and prosecution history of these patents clearly ascribe a distinct, if not broader, scope to this claim language. In particular, common specification language in the '121 and '469 patents clearly distinguishes between "temporary" and "dynamically assigned" network protocol addresses. '121 patent col.2 ll.41–42 ("The ability to locate users having temporary <u>or</u> dynamically assigned Internet Protocol address[es] has been difficult . . .") (emphasis added); '469 patent col.2 ll.38–39 (same).[4] RFC 1531 makes clear that, in certain network environments, a permanent IP address may be "dynamically allocated" via DHCP, and that a temporary IP address in some cases may be manually assigned by a network administrator rather than "dynamically allocated." To the extent that "network protocol address that is assigned on a temporary basis" and "dynamically assigned network protocol address" overlap, the defendants' proposed construction is redundant. See Cleancut, 2011 WL 5057005, at *2. To the extent they diverge, the specification

---

[4] The Court notes in particular the absence of commas or other punctuation that might otherwise identify either "temporary" or "dynamically assigned" as an appositive of the other. See generally The Chicago Manual of Style § 5.49 (14th ed. 1993).

language and the prosecution history upon which the defendants rely contain no clear and unmistakable disclaimer of the full scope of the claim language. See Thorner, 669 F.3d at 1366–67.

Accordingly, the Court **FINDS** that the ordinary and customary meaning of the term "dynamically assigned network protocol address" found in claim 33 of the '704 patent and claim 8 of the '121 patent, as understood by a person of skill in the art at the time of invention, is "a network protocol address assigned to a host for a limited period of time (or until the host explicitly relinquishes the address)."

### E. "computer usable medium"

The disputed claim term "computer usable medium" is found in claims 1 and 38 of the '704 patent and claim 1 of the '365 patent. The plaintiff contends that no construction of this claim term is necessary as it has a plain and ordinary meaning. In their claim construction brief, the defendants contended that this term should be construed to mean "floppy disks, magnetic tapes, compact disks, or other storage media." At hearing, the defendants verbally amended their proposed construction to add "hard disks" to the list of items they consider to be included within the scope of "computer usable medium."

The Court **FINDS** that the ordinary and customary meaning of the claim term "computer usable medium," as understood by a person of skill in the art when read in the context of the entire patent, is readily apparent even to a layperson. See Phillips, 415 F.3d at 1314. Moreover, the specification language upon which the defendants rely is (1) a non-exhaustive listing of computer usable media in which program code might be embedded, and (2) describes an exemplary embodiment of the invention. See '704 patent col.3 ll.55–62; '121 patent col.5 ll.26–33; '469 patent col.5 ll.33–40; '365 patent col.3 l.63–col.4 l.3; '066 patent col.4 ll.11–19. The cited specification language contains no clear and unmistakable disclaimer of the full scope of the claim language, and

it would be improper to construe the claims of the patent as being limited to the described embodiment. See Thorner, 669 F.3d at 1366–67; Phillips, 415 F.3d at 1323. Accordingly, the Court **DECLINES** to construe this claim term. See O2 Micro Int'l, 521 F.3d at 1360, 1362.

### F. "assigned to the process upon connection to the computer network" and "received by the first process following connection to the computer network"

The disputed claim term "assigned to the process upon connection to the computer network" is found in claims 33 and 38 of the '704 patent. The disputed claim term "received by the first process following connection to the computer network" is found in claim 1 of the '704 patent and claims 13 and 14 of the '121 patent. The plaintiff contends that no construction of these claim terms is necessary as each has a plain and ordinary meaning. The defendants contend that these terms should be construed to mean "network protocol address that is assigned on a temporary basis each time that a connection is made to the computer network."

The Court **FINDS** that the ordinary and customary meaning of the claim terms "assigned to the process upon connection to the computer network" and "received by the first process following connection to the computer network," as understood by a person of skill in the art when read in the context of the entire patent, is readily apparent even to a layperson. See Phillips, 415 F.3d at 1314. Moreover, the specification language and prosecution history upon which the defendants rely contains no clear and unmistakable disclaimer of the full scope of the claim language. See Thorner, 669 F.3d at 1366–67. Accordingly, the Court **DECLINES** to construe these claim terms. See O2 Micro Int'l, 521 F.3d at 1360, 1362.

### G. "off-line message" and "online message" or "on-line message"

The disputed claim term "off-line message" is found in claims 3 and 8 of the '066 patent. The disputed claim term "online message" or "on-line message" is found in claims 6 and 7 of the

'066 patent. The plaintiff contends that no construction of these claim terms is necessary as each has a plain and ordinary meaning. The defendants contend that these terms should be construed to mean "message indicating that a process is not online" and "message indicating that a process is online," respectively.

The Court **FINDS** that the ordinary and customary meaning of the claim terms "off-line message" and "online message" or "on-line message," as understood by a person of skill in the art when read in the context of the entire patent, is readily apparent even to a layperson. See Phillips, 415 F.3d at 1314. Indeed, the defendants' proposed construction appears to be nothing more than an exercise in "picking flyspecks from pepper." See Fellowes, Inc. v. Michilin Prosperity Co., Ltd., No. 2:06cv289, 2006 WL 3746140, at *1 (E.D. Va. Dec. 15, 2006). Accordingly, the Court **DECLINES** to construe these claim terms. See O2 Micro Int'l, 521 F.3d at 1360, 1362.

### H. "providing one of the network protocol address and the associated identifier of said one process"

The disputed claim term "providing one of the network protocol address and the associated identifier of said one process" found in claim 3 of the '365 patent. The plaintiff contends that no construction of this claim term is necessary as it has a plain and ordinary meaning. In their claim construction brief, the defendants contended that this term should be construed to mean "the server retrieves the network protocol address and identifiers from its database and sends it to the another [sic] process." At hearing, the defendants noted that the first use of "and" in their proposed construction was a scrivener's error; the defendants verbally amended their proposed construction to substitute "or" in its place.

The Court **FINDS** that the ordinary and customary meaning of the claim term "providing one of the network protocol address and the associated identifier of said one process," as understood by a person of skill in the art when read in the context of the entire patent, is readily apparent even to a

layperson. See <u>Phillips</u>, 415 F.3d at 1314. Accordingly, the Court **DECLINES** to construe this claim term. See <u>O2 Micro Int'l</u>, 521 F.3d at 1360, 1362.

## IV. CONCLUSION

For the foregoing reasons, the Court **FINDS** that the term "point to point" found in claim 1 of the '704 patent, claims 8, 13, and 14 of the '121 patent, claim 5 of the '469 patent, claims 1 and 3 of the '365 patent, and claims 1, 2, 6, and 7 of the '066 patent means "communications between two processes over a computer network that are not intermediated by a connection server or an address server." The Court also **FINDS** that the term "dynamically assigned network protocol address" found in claim 33 of the '704 patent and claim 8 of the '121 patent, means "network protocol address assigned to a host for a limited period of time (or until the host explicitly relinquishes the address)." Finally, the Court **DECLINES** to construe the following claim terms: (1) "establishing a point-to-point communication"; (2) "to allow the establishment of a packet-based point-to-point communication"; (3) "network protocol address"; (4) "computer usable medium"; (5) "assigned to the process upon connection to the computer network"; (6) "received by the first process following connection to the computer network"; (7) "off-line message"; (8) "online message" or "on-line message"; and (9) "providing one of the network protocol address and the associated identifier of said one process."

**IT IS SO ORDERED**.

October 26, 2012
Norfolk, Virginia

/s/
Robert G. Doumar
Senior United States District Judge

25